THOMAS M. LEAGUE, PLAINTIFF IN ERROR, v. JOHN DE YOUNG, SURVEYOR FOR THE DISTRICT OF GALVESTON, AND SAMUEL P. BROWN, DEPUTY.

Before the admission of Texas into the Union, that State passed many laws upon the subject of head rights to land, the general object of which was to ascertain and secure valid titles, and prevent frauds, by acts of limitation and by the establishment of boards of commissioners to separate the bad from the good titles.

In the constitution adopted just before her admission into the Union, there was an article annulling fraudulent certificates, and opening the courts, up to a certain day, to suitors for the investigation of their claims.

It was perfectly competent for the people of Texas to pass these laws and adopt this constitution.

Moreover, they were all passed before the Constitution of the United States had any operation over Texas, and cannot therefore be in conflict with any of its provisions.

THIS case was brought up from the Supreme Court of the State of Texas, by a writ of error issued under the twenty-fifth section of the Judiciary Act.

The plaintiff in error, Thomas M. League, applied to the District Court for the county of Galveston, in Texas (State court), for a mandamus to be issued to John De Young, the surveyor, and his deputy, to compel them to survey a league and labor of land, which League alleged that he was entitled to by virtue of a certificate issued to Catin F. McRea by the board of land commissioners of the county of San Augustine,

.16*

republic of Texas, on the 21st of June, 1838; which certificate League alleged had been assigned to him.

Instead of tracing, chronologically, the history of the laws, the reporter refers to the narrative given in the opinion of the court. The following is a list of the public documents set forth by the petitioner as exhibits to his petition, and which occupied upwards of a hundred printed pages of the record.

1. A decree of the Congress of the State of Coahuila and Texas. March 24, 1825.

2. Instructions to Commissioners. September 4, 1827.

3. Decree of the Congress of the State of Coahuila and Texas. May 2, 1835.

4. Declaration of the People of Texas in General Convention assembled. November 7, 1835.

5. Establishment of a Provisional Government in Texas. November 13, 1835.

6. Declaration of Independence of Texas. March 2, 1836.

7. Constitution and Declaration of Rights of Texas. March 17, 1836.

8. An act entitled "An act to reduce into one act, and to amend, the several acts relating to the establishment of a General Land-Office." December 14, 1837.

9. Joint Resolution respecting County Surveyors. December 29, 1837.

10. An act amending an act supplementary to an act entitled "An act to reduce into one act, and to amend, the several acts relating to the establishment of a General Land-Office." January 26, 1839.

11. An act to detect fraudulent land certificates, and to provide for issuing patents to legal claimants. January 23, 1840.

12. An act prohibiting the location of fraudulent land claims. February 5, 1840.

13. An act to provide for the return of surveys, for the collection of government dues on lands, and for other purposes. February 5, 1840.

14. An act defining the mode by which the holders of conditional certificates shall establish the same. January 15, 1841.

15. An act supplementary to an act to detect fraudulent land certificates, and to provide for issuing patents to legal claimants. February 4, 1841.

16. An act supplementary to an act supplementary to an act to detect fraudulent land certificates, and to provide for the issuing patents to legal claimants. 1843.

17. Ordinance of the Convention of Texas, accepting the proposal of the Congress of the United States to admit Texas into the Union. July 4, 1845.

18. Constitution of the State of Texas. 1845.

19. An act to establish a General Land-Office for the State of Texas. May 12, 1846.

On the 30th of June, 1847, League filed his petition in the District Court for the first judicial district of the State of Texas, in and for the county of Galveston.

On the 1st of December, 1847, the District Court laid a rule upon the defendants to show cause why a peremptory mandamus should not issue as prayed, and on the 21st of December, 1847, the defendants filed a general demurrer and exception, upon the ground that the plaintiff's petition is not sufficient in law. The following is a summary of their answer.

1st. Because it does not appear that the plaintiff has any cause of action against the defendants.

2d. Because this is really a suit against the State of Texas, which has not given its consent to be so sued.

And for further special exceptions the defendants say, —

1st. It does not appear from said petition that the people of Texas made any contract by which they were or are bound to concede, grant, or perfect title to, any such land, &c.

2d. It does not appear that the said supposed rights and claims to land of persons residing in Texas on the day of the declaration of independence were ever vested and established, as the plaintiff in his said petition alleges and pretends.

3d. Because the constitution of the republic of Texas amounts to no contract between the people of Texas in their corporate capacity, &c., and any persons or class of persons residing in Texas, as the plaintiff in his petition pretends; nor does it appear that the people of Texas, in their corporate political capacity, agreed, contracted, or promised as the plaintiff alleges and pretends.

4th. It does not appear that the general land law of the republic of Texas ever amounted to a contract between the people of Texas and any person in the petition mentioned, nor does it appear that said people, through their representatives, ever promised, contracted, or agreed that such certificate should be sufficient evidence to authorize any lawful survey, or, for any person holding or owning such certificate, to survey such lands as he might point out, &c.

5th. It does not appear that the said people contracted or agreed that such certificate should be sufficient evidence to authorize the surveyor, &c., to survey any lands forming a portion of the public domain; or that they are bound to make such survey; or that by refusing so to do they are guilty of any neglect or breach of duty.

After reserving all exceptions, &c., the defendants for plea

League v. De Young et al.

say, the plaintiff ought not to have or maintain his action, for that the general land law is unconstitutional, &c.

And for further plea they say, that the act " to detect fraudulent land certificates," and that," to prohibit the location of fraudulent land claims," &c., and the act " supplementary to the act to detect fraudulent land certificates," &c., were not made in violation of the constitution of the republic of Texas, as the said plaintiff pretends ; nor do said acts, nor does the eleventh article of the constitution of the State of Texas, contravene the Constitution of the United States, as said plaintiff also pretends; and that the said plaintiff (as he admits) never established said certificate according to said acts, or according to said eleventh article, nor has he attempted so to do.

For further plea he says, the board of general and local commissioners under the first-mentioned act failed and refused to report this certificate as genuine ; that its location was prohibited until so reported, or established under the said supplementary act, or the said eleventh article ; and that, until it might be so established, the said plaintiff was entitled to no location or survey thereof.

That the said supplementary act, while it remained in force, and the said eleventh article, gave a sufficient and an adequate mode of establishing said certificate, which said plaintiff failed to adopt; and that he has not made the proof, nor complied with the requisites, prescribed by the said eleventh article of the constitution of the State of Texas.

They answer that they were not bound to make said survey, and that their said refusal has violated no law nor any legal right of the plaintiff, and amounts to no breach or neglect of duty on their part.

The defendants annexed two exhibits to their answer ; one was "An Act to regulate proceedings in the District Courts," consisting of 158 sections, and occupying thirty pages of the printed record, and the other, " Rules for the Government of the District Courts, adopted by the Supreme Court, 23d April, 1847."

On the 22d of December, 1847, the District Court, after argument, dismissed the rule which had been laid *nisi* upon the defendants, and at December term, 1847, the Supreme Court of Texas, to which the case had been carried, affirmed the decision.

League sued out a writ of error, and brought the case up to this court.

It was argued by *Mr. Ovid F. Johnson* and *Mr. Wood*, for the plaintiff in error, and *Mr. Harris*, for the defendant in error.

League *v.* De Young et al.

The counsel for the plaintiff in error made the following points.

I. The decision of the commissioners awarding the head right certificate set forth in the pleadings, was a judicial decision.

First. The republic was bound under a prior obligation to award the land. Constitution of Republic, § 10; Colonization Law of Coahuila and Texas, 1825; Decree No. 16, p. 15; 1 White's New Recopilacion, p. 559; Decree of Coahuila and Texas, No. 309, p. 297; Declaration of People in Convention, art. 8, p. 4; Plan of Provisional Government, art. 15; Declaration of Independence, p. 4; Acts establishing General Land Office, Dec. 14, 1837, §§ 11, 15, 17, 36; Laws of 1837, p. 62.

Second. The proceedings involved a *lis pendens*, a subject-matter to be settled between the claimant and the government. Midhurst *v.* Waite, 3 Burr. 1259; 2 Hill, 11, 14; 26 Wend. 212, 220.

Third. The subject-matter to be settled required, and the acts provided, that proof should be taken, and in some cases a jury was introduced in order to ascertain and settle the rights of the parties. Act of 1837, §§ 11, 17.

Fourth. An appeal to a higher tribunal was given to the claimant in case the decision was against him. The State dispensing with such appeal in its own behalf, on the ground that the commissioners, as is usual in such cases, were designed to represent them. McMin· *v.* Stafford, 2 Bibb, 487; 19 Wend. 56, 59; 9 Ib. 508; 8 Johns. 44, 69; 3 New Hamp. 265; 4 Bingham, 686; Phillips on Evidence, Cowen & Hill's notes, pp. 906 – 915, No. 637; Ib. 997, 1000, No. 694; Ib. 853, No. 609; 1 Peters, 201, 666, 667; 1 Bibb, 22, 229; 3 Bibb, 137, 426; 3 Littell, 152, 154; 7 Dana, 141; 4 Yerger, 525; 6 Yerger, 85, 86; 2 Dall. 317.

Fifth. The powers were transferred to the District Court by the act of 1839.

Sixth. The fact that proceedings are summary does not divest them of their judicial character.

II. The proceedings being judicial, the decision therein, that the claimant is entitled to a head right certificate, is also judicial.

III. The said decision, and the head right certificate issued and founded upon it, is a perfect right to the quantity of land awarded, forming an obligatory contract, as solemn and binding as a more formal judgment, and is conclusive unless reversed upon review for error, and cannot be impeached collaterally. 1 Douglass, 407; 4 Greenleaf, 531; Le Guen *v.* Gouverneur and Kemble, 1 Johns. Cas. 437; 19 Wend. 56; Moody *v.* Thurston, Strange, 481; Grignon's Lessee *v.* Astor, 2 How-

ard, 319; Hargrave's Law Tracts, 446; 1 Salkeld, 396; 2 Bos. &
Pul. 392; 1 Bibb, 22, 229; 2 Bibb, 487, 488, 134; 3 Bibb, 137,
138, 426; 3 Litt. 152, 160; 7 Dana, 141; 2 Tennessee R. 21;
1 Yerger, 303, 328, 346, 350; 4 Yerger, 525; 1 Cook, 214, 216;
1 Stewart, 504; Walker, 492; 1 Peters, 666, 667; 18 Peters,
517; 7 Wheat. 240, 244; 1 Peters, 212; 8 Peters, 444; 9 Peters,
153, 154; 20 Howell's State Trials, 538; Ambler, 761; 7 T.
R. 269; Co. Lit. 303, c; 4 Rawle, 288; 1 Salkeld, 230; 7 Mis-
souri R. 15; 5 Howard, 28; 6 Peters, 728, 732; 1 Texas R.
438, 788, 801, 802, 804; 6 Peters, 728, 732; 6 Cranch, 87 et
seq.; 9 Howard, 171, 445, 447; 7 Durnf. & East, 692, per Ld:
Kenyon; 3 Dallas, 54; 1 Peters, 340; Cowen and Hill's Phil-
lips, 891; 5 Johnson, 689; Smith v. Lewis, 1 Irish T. R. 20,
43; 2 Bos. & Pul. 392; 13 Peters, 498; Mackeldy, Comp. Civil
Law, Kauffman's ed., § 208; 1 Pothier on Cont. (Evans's edi-
tion), 350, 416; Hugo, Histoire du Droit Romain, § 373; 10ig.
2, 17, 50; Code, 752; Extravaganza, 2, 27; 1 Moreau and
Carlton's Part. 321; Recop. Castella, tit. 4, 6, 17; Institutes,
292; 1 White's New Recop. 306, 307; 2 Texas R. 320, 272.

IV. A judgment establishing and conferring a general right
is just as obligatory as if it awarded a specific parcel of land or
personal property, and is as much protected by the Constitution.

V. The decision in question was complete, and not inchoate,
and adequate remedies had been provided for its execution.

VI. The acts of 29th January, 1840, 5th February, 1840,
4th February, 1841, 12th May, 1846, and the State constitu-
tion of 1845, article 11, delay and hinder this claimant in en-
forcing his said decision as well prior as subsequent to the an-
nexation of Texas; and, so far as they delay and hinder the
enforcement of said decision since the annexation, they violate
the United States Constitution, and prior thereto the Texas
Declaration of Rights of 1836.  2 Howard, 608; 10 Conn. 522,
541; 1 Pick. 224; 13 Vermont, 525; 2 Stewart, 30; 1 Dana,
481, 486; 9 Yerger, 490; Minor, 23; 7 Gill & Johns. 7; 17
Johns. 195, 215; 3 Howard, 133; 4 Wheat. 122, 197; 1 Howard,
311; 4 Litt. 47; 8 Wheat. 1; 1 Denio, 128; 4 Gill & Johns.
146, 148; 9 Howard, 245; 6 Cranch, 87; 1 Simons, 251; 2
Chancery R. 497; 4 Wheat. 5, 18; Peck, 18; 4 Litt. 34, 47;
Story on Const. §§ 1368, 1391; 2 Ld. Raym. 952; 3 Greenleaf,
326; 2 Texas R. 319, 320.

First. The constitution of the State of Texas of 1845, arti-
cle 7, § 20, provides " that the rights of property and of ac-
tion which have been acquired under the constitution and laws
of the republic of Texas shall not be divested." And as the
rights of property and of action in this case were so acquired,
established, and protected by the decision of the board of land

commissioners, they could not be divested, barred, or affected by attaching to their assertion such conditions as are specified in the eleventh article of the said constitution. Nor could the said rights be utterly barred, and declared to be for ever null and void, as in the said last-mentioned article is attempted to be done.

Second. The certificate produced in this case never was declared to be null and void by any law of the republic of Texas, and, upon the adoption of the State constitution, was conclusive evidence of a valid and subsisting right founded on contract, although delayed and clogged by such unauthorized modifications of the remedy for its enforcement as precluded the plaintiff from the immediate enjoyment of its benefit.

Third. The State constitution recognized the right founded upon it, but sought to couple it with such remedies as impaired the obligation, and finally destroyed it altogether, in direct violation of the provisions of the federal Constitution.

Fourth. The certificate, as a judicial act, estopped the State from denying the right it established; and the subsequent steps necessary to obtain a patent being mere ministerial acts, the State had no authority so to regulate them, or to obstruct their performance, as to impair that right. The remedy was subject to such modification as the State saw fit to make without prejudice to the right; but that was absolute and inviolable.

Fifth. All the laws formerly in force in the republic of Texas, now alleged to be in force in the State of Texas, and relied on to defeat and hinder the plaintiff in procuring a survey and patent on the certificate described in this suit, are in force by virtue of their supposed adoption, continuance, and recognition by the State constitution, and as such are in manifest derogation of the provision of the federal Constitution prohibiting the passage of laws impairing the obligation of contracts.

VII. This court has jurisdiction on writ of error to review the decision of the Supreme Court of Texas, it being the highest court of law within that State, and involving the validity of a statute, as well as a constitutional provision of this State, together with the authority exercised under them, on the ground of their being repugnant to the United States Constitution, and of the decision in favor of their validity. Constitution U. States, Art. 1, § 10; Act of Congress, Sept. 24, 1789, § 25; Constitution of Texas, 1837; Declaration of Rights, Art. 16.

It is sufficient if it appear on the record that the question must have arisen. Davis *v.* Packard, 6 Peters, 41; Hickie *v.* Starke, 1 Peters, 94; Harris *v.* Dennie, 3 Peters, 292; Smith *v.* Hunter, 7 Howard, 738.

Rights of property remain the same after as before the adoption of the State constitution. State Constitution, Art. 7, § 20; 7 Peters, 51, 87; 1 Dall. 78; 2 Dall. 394, 395.

VIII. The common law was in force in Texas in 1837 (Laws of Texas, 1836, pp. 156, 157), and the mandamus in the present case was the appropriate remedy. Marbury v. Madison, 1 Cranch, 137; Bradley v. McCrab, Dallam's Digest, 504, 506, 524, 381; Boman v. Moody, Dallam, 512; Allen v. Ward, Dal. 371, 137; Dallam, 366; 2 Texas R. 57, 357, 451, 67, 78; Hartley's Dig. 120; Hartley's Dig. 237, art. 643; 12 Peters, 620; 1 Texas R. 84, 85, 542; 1 Simons, 251.

IX. No other constitutional remedy has been provided in Texas for the present case; and not to allow the mandamus would be a denial of justice, and would defeat the provision of the United States Constitution. In regard to impairing the obligation of contracts, a dissent on the part of the State to the remedy cannot be inferred from acts providing an unconstitutional remedy. Directory upon government, 9 Marsh. 423; Angel & Ames, 137, 138, 157; 1 Mur. 155; 4 Cow. 297; 7 Cow. 402; 5 Cow. 269; 8 Barn. & Cres. 29; 11 Wend. 611; 5 Hill, 21; 5 Jacob's Law Dict. 76; 6 Hill, 62, 646; 3 Serg. & Rawle, 29.

The counsel for the defendant in error made the following points.

The writ of error alleges that the decision of the Supreme Court of Texas was against the validity of the treaty of the United States which was drawn in question, and was in favor of the statutes and of the eleventh article of the constitution of the State of Texas, which were drawn in question on the ground that they were repugnant to the Constitution, treaties, and laws of the United States.

It is respectfully submitted, that the only treaty which can possibly bear any relation whatever to the merits of this cause is that by which Texas was annexed to the United States; and in considering the terms and stipulations of that treaty, it seems difficult to arrive at the conclusion that it intended to make valid that class of claims to which this belongs. The reverse of the proposition appears to conform much more to the intention of the treaty.

For the joint resolution of Congress for the annexation of Texas provides, " that the territory belonging to the republic of Texas may be erected into a new State with a republican form of government, to be adopted by the people of said republic, by deputies in convention assembled, with the consent of the existing government, in order that the same may be admitted as one of the States of this Union."

It further provides, that " the constitution of said State, with the proper evidence of its adoption by the people of the said republic of Texas, shall be transmitted to the President of the United States, to be laid before Congress for its final action, on or before the 1st of January, 1846."

The proposition contained in this joint resolution was assented to by the government of Texas, and it was also assented to by the people of said republic, by an ordinance of the deputies, in convention assembled, on the 4th of July, 1845.

A constitution for the State of Texas was formed in accordance with the provisions of the said joint resolution. Among other things, this constitution contains a provision that it shall be submitted to the people of Texas (for their adoption or rejection) on the second Monday in October, 1845; and it further provided, that at the same time the vote should be taken for and against annexation. The eleventh article also provided, that certificates of the class upon which this suit was instituted should be established according to the provisions of the aforesaid supplementary act, before the 1st of July, 1847, and if not so established or sued upon as therein provided before that time, the said certificates, and all locations and surveys thereon, should be for ever null and void. It further provided, that the aforesaid ordinance should be attached thereto and form a part thereof.

This constitution was adopted, and annexation was assented to by the people of Texas. The constitution, the evidence of its adoption by the people of Texas, and their assent to annexation, have been duly transmitted to the President of the United States. Upon these, with all their terms and conditions, by a joint resolution of Congress, Texas was admitted as one of the States of the Union.

Then here was a proposition for annexation made by the government of the United States. The proposition is accepted by Texas, but, among other things, upon the conditions contained in the eleventh article of her State constitution. These conditions are accepted and adopted by the general government. Then we contend that this article cannot be justly said to be repugnant to any treaty of the United States. On the contrary, it may be said to be incorporated into the treaty for annexation, and to form a part of it. So far from being condemned by the treaty, it is most solemnly guaranteed by it.

It may be considered to be a more correct view of the subject to say that Texas proposed to be annexed to the United States, and, among other things, upon the conditions contained in the eleventh article of her State constitution; and that this proposition was accepted by the " joint resolution of Congress

for the admission of the State of Texas into the Union." Upon either view of the subject, this article forms a part of the treaty, and is sustained, in place of being condemned, by it.

If these views of the subject be considered as at all correct, then the eleventh article of the constitution of the State of Texas violates no law of the United States; for the joint resolution last aforesaid may be said to be a treaty, or a law, or a contract (for it partakes of the nature of all these) of the United States, in which this article may be said to be fully incorporated as a part of either. Then, so far from being considered as a violation of any law of the United States, it may itself be regarded as a law of that government.

Let us now see whether the said acts of the republic of Texas, or the eleventh article aforesaid, at all contravene that provision of the Constitution of the United States which says, that " no State shall pass any law impairing the obligation of contracts." Now it would seem obvious enough, that laws enacted by Texas, and a constitution adopted by her when she was an independent republic, could in no wise contravene the Constitution of the general government. Texas being then a separate republic and an independent government, could not have been considered as restrained by a constitutional provision against the States of this Union. It cannot be said that these laws or this article were made in violation of the terms of the Constitution of the United States. And it does not seem to be consistent either with the terms or with the spirit and meaning of that instrument, to say that the convention which framed or the people who adopted it designed this clause as an inhibition against separate or independent republics or nations.

Again, it is obvious enough that it was not the intention of this clause to inhibit Congress from passing any law, or making any treaty, impairing the obligation of contracts. And whether we view the annexation of Texas as affected by the one or the other of these means, we must still agree that it was consummated by the consent and act of Congress. And, in whatever view it may be seen, we most respectfully contend, that it must still be regarded as a law, or an act of Congress, unrestrained by this clause of the Constitution of the United States.

And viewing annexation as a contract between two independent nations, and both equally competent to contract, it seems consistent with reason and law, that both of the contracting parties should be bound by all its terms and stipulations. It would certainly be a departure from the ordinary construction of contracts to determine that in this instance it was bind-

ing upon one side only. The want of equity of such an interpretation becomes extremely prominent, when it is borne in mind that the provisions of the eleventh article of her State constitution were offered, on the part of Texas, as an indispensable condition of the contract.

And it is further contended, that there never existed between the grantee of the certificate and either the republic or the State of Texas, any contract which the aforesaid acts of the republic, or the eleventh article of the constitution of the State, could have impaired. The only law under which the grantee could claim any land of the republic was decree No. 190 of the Congress of the State of Coahuila and Texas (see Laws Coahuila and Texas, 189); or the act of 1835 (see Laws Coahuila and Texas); or the tenth section under the general provisions of the constitution of the Republic of Texas. Now, in order to make the contract valid between the grantee and the State of Coahuila and Texas, he must have complied with the provisions of the said decree No. 190, particularly that contained in the eighth article, and then, by the twenty-second article, he would have been entitled to the one half of a *sitio* of grazing land. It will be seen from the certificate that the grantee was a foreigner; for it says that he proved he arrived in the republic of Texas in the year 1834. Then we contend, that if the claim be regarded as being based upon that law, viz. decree No. 190, it amounted to no contract, for there is nothing to show that the grantee ever complied with its requisitions, and the quantity contained in the certificate very far exceeds that prescribed by the law.

If, on the other hand, it be regarded as based upon the said act of Coahuila and Texas of 1835, or the said tenth section of the constitution of the late republic, then we contend that there was no contract between the grantee and the republic; for, by reference to the act of 1835, and to this section of the constitution, it will be seen that their provisions only amount to a donation of lands to those persons who were residing in Texas before the passage of the act of 1835, or on the day of the declaration of independence.

In addition to the head rights which the citizens received, the republic paid each soldier for whatever services he might render. Ordinances and Decrees of the Constitution, 22, §§ 4, 5; Ibid. 78, 79, 87, 88, 93; and 1 Statutes, 34, § 4.

Upon these provisions alone claims for head rights rested, until the 14th of December, 1837, when the Congress of the republic passed an act, entitled "An Act to reduce into one act, and to amend, the several acts relating to the establishment of a general land-office." See 2 Laws, 62. It will

be seen by reference to this act (particularly its twelfth section), that this gave to colonists, or persons residing in Texas, no new right, but only intended to provide an adequate remedy by which those rights might be rendered available which had accrued under the said colonization laws, and under the said tenth section of the constitution of the republic. It was, in other words, a law creating a remedy by which preëxisting rights might be litigated; but it purported to give no new right, and least of all does it seem to intend to create, on the part of the republic, a technical and binding contract, which subsequent enactments could never change. And we contend that the right to any land exists (if it exists at all) by virtue of a compliance, on the part of the grantee, with the provisions of the colonization law of 1832, or in consequence of his having been included within the provision of the act of 1835, or that of the tenth section under the general provisions of the constitution of the late republic, and not by virtue of any certificate obtained under the act of 1837, which, we contend, relates not at all to the right, but to the remedy only. In other words, if he had any right, it was not because he obtained the certificate under the act of 1837, but because he had made with the State of Coahuila and Texas a valid contract for it under the act of 1832, or because it had been donated to him by the act of 1835, or by said tenth article in the constitution of the late republic.

We contend that the issuance of the certificate created no contract whatever on the part of the government. For the granting of the certificate was based upon no consideration; whereas, under every system of laws, a consideration is an indispensable requisite of a legal and valid contract.

And it will be clearly seen, by reference to the acts of 1840, and to the eleventh article of the constitution of the State, that they affect no right which may have accrued either under the act of 1832 or under that of 1835, or the said tenth section of the constitution of the late republic. They neither affect to repeal the law of 1832, nor that of 1835, nor to render null any right or contract which existed in virtue of their provisions; nor do they affect to withdraw, or to defeat, or to impair this constitutional provision. So far from annulling, or divesting, or destroying these rights, it was the direct object and tendency of the acts of 1840, and of the constitutional provision of 1845, to guard, to sustain, and to secure them.

The acts, &c., complained of by the plaintiff in error, only intended to change the remedy provided by the act of 1837; and this is all which they really effect.

The republic of Texas was not bound, by the terms of any

contract, to pass the act of 1837. This was a law gratuitously passed by its legislature. The republic had entered into no obligation or contract to pass such a law; and least of all had it obligated itself to permit this remedial law to remain for ever unchanged. Nor was there an application for a survey while the provisions of the seventeenth section of the act of 1837 remained in force; but he waited till the proffer contained in that section was in effect repealed, or withdrawn, by the act of 1840.

Again, remedial laws may, at any time, be altered, or even repealed.

This action, it may be said, is based entirely upon the seventeenth section of the act of 1837. And this section, by its terms, contemplates the passage of subsequent laws altering its provisions.

This section regards the certificate, not as a contract, but as " sufficient evidence to authorize the surveyor to survey the land." The terms of the section give to the certificate that force only. Now, *evidence* belongs to the *remedy;* and the legislature can, at any time, alter, or even repeal, the remedy. Story, Conflict of Laws, § 467, note; Townsend *v.* Townsend, Peck, 15–18; 6 U. S. Cond. Rep. 535; Mason *v.* Haile, 12 Wheat. 370; Sampeyreac case, 7 Peters, 222; Ibid. 546, 549, 550, 557; Springfield *v.* Hampden Commissioners, 6 Pick. 508.

An act, like that of 1837, which confers jurisdiction, is subject entirely to the control of the legislature. Stoover *v.* Immell, 1 Watts, 258; Road in Hatfield, 4 Yeates, 392. The repeal would have divested all such rights, under the provisions of the act, as have not been consummated. Buller *v.* Palmer, 1 Hill, 324, 330; Meller's case, 1 Blackf. 451; Meiggs *v.* Hunt, 12 Moore; Rey *v.* Goodwin, 4 Moore & Payne, 441, 451; Dwarris on Statutes, 676.

If the above position be correct, then Texas had the power to modify or change the act of 1837 by those of 1840.

It is conceived that the Sampeyreac case, 7 Peters, 222, bears a striking analogy to this. In that case suit was instituted in the Superior Court of the Territory of Arkansas, in the name of Bernardo Sampeyreac, against the United States, to recover a tract of land in the petition described. During the same year (about the 20th of December) a judgment was rendered in favor of the plaintiff. No appeal was taken within one year; and consequently, by the terms of the statute under which the suit was instituted, the decision became final and conclusive between the parties. The interest in this decree was by deed (purported to be made by Sampeyreac) transferred to John J. Bowie, and in December, 1828, Bowie trans-

League *v.* De Young et al.

ferred the decree to Joseph Stewart. On the 13th of December, 1828, Stewart's application was admitted in the land-office. At the April term, 1830, the United States attorney filed a bill of review, in which he stated that the decree was obtained by fraud, that the witnesses committed perjury, and that Sampeyreac was a fictitious person. Subsequently to this, viz. on the 8th of May, 1830, an act was made giving the courts power to revise such decrees upon bills of review. It was contended that the act of 1830 was unconstitutional, because made in violation of that provision of the Constitution of the United States which says that "no person shall be deprived of property without due process of law"; and also that which says that "private property shall not be taken for public use without just compensation." See Dartmouth College *v.* Woodard, 4 Wheat. 644, 645. But the decree in the Sampeyreac case was reversed; and it was decided that the act of 1830 applied only to the remedy, and therefore did not violate the Constitution of the United States.

When the certificate was issued, and when the acts of 1837 and 1840 were enacted, the laws of Mexico were in force in Texas. That system provides, that, if a judgment be fraudulent or be obtained by perjury, the party against whom it was rendered may have it annulled at any time within twenty years from the day of its date, &c. 1 Partidas, 321, 322; 1 White, 306.

Again, this is a mandamus against the State without its consent; and it is an attempt to evade the well-established principle, that the sovereign authority cannot be sued in its own courts without its express assent to the suit.

Where a party has another specific remedy, a mandamus never issues at all. 5 Comyn's Dig. 21. The act of 1840 did not take away all remedy, and the act of 1841 gave a remedy which is reasonable, adequate, and complete.

It is contended that the plaintiff in this cause can occupy no higher ground than that which could have been occupied by the grantee of the certificate. The certificate is at best but the evidence of a naked right or a chose in action, which by the general law was neither assignable nor transferable. And there is no special law which enables the grantee to sell or transfer the certificate. But the tenth section under the general provisions of the constitution of the republic, the fifteenth section of the first general land law (1 Laws, 129), and the twelfth and seventeenth sections of the present act, only made valid the sale or transfer of the right which the claimant had to the land. He could sell his own right or claim to the land, but nothing more.

This court has decided that the clause in the Constitution of the United States, upon which the plaintiff relies, has no retrospective operation.    Owings v. Speed, 5 Wheat. 420.

The case under consideration is stronger than the one cited; for the acts of 1840, and the constitutional provision of 1845, were in full force when Texas was an independent republic, and their continuance may be said to be guarantied by the treaty of annexation.

The case of Calder v. Bull (3 Dall. 386) may be said to bear a striking similitude to this.    There the Probate Court had rendered a decree in that cause, and the adverse party had so long slumbered over his rights, that this decree had, under the law, become final by the lapse of time.    The State of Connecticut then passed a law annulling this decree, and this court unanimously determined that this law did not violate the Constitution of the general government. A State can pass retrospective laws creating contracts where none existed before; it can pass retrospective laws; can exercise judicial functions; and it can pass a law that will divest vested rights.    Satterlee v. Matthewson, 2 Pet. 412, 413.

These are powers certainly as great as those complained of, which Texas exercised while she was a separate republic.

We might suppose this to be a contract in the strict sense of that term, and still we believe it could be successfully contended that the acts of 1840 never even violated the constitution of the late republic, and that the eleventh article of the State constitution could, under no view, violate the Constitution of the United States.    For the "obligation" of a contract is defined to be "the law that binds a party to perform his undertaking."    Sturges v. Crowninshield, 4 Wheat. 197; Ogden v. Saunders, 12 Wheat. 318; Blair v. Williams, 4 Littell, 34; Lapsley v. Brashear, Ibid. 47.

The Constitution refers to and preserves the legal, not the moral obligation.    Ogden v. Saunders, 12 Wheat. 337.

The "obligation" of contracts intended by the constitution is not the universal law of civilized nations any more than the moral law, &c.    Ogden v. Saunders, 12 Wheat. 213.

The republic never gave its consent to be thus sued; and had it been given, it might have been withdrawn at pleasure. Story's Const. 625.    So that the republic could not have been legally bound to perform its contracts; or, in other words, there was no legal obligation to perform them.

Under the Constitution of the United States, and amendments thereto, a State cannot be sued in the courts of that government, except by another State.    Then under this government there are no means of compelling a State to perform.

its contracts with individuals, in cases in which the State may be defendant. Then there is no legal obligation to perform them. See second section under article third, and the eleventh article of the Amendments.

Texas was not annexed until the 16th of February, 1846, the day on which the first legislature of the State convened. See the joint resolution for annexing Texas, &c., approved the 1st of March, 1845; 5th, 6th, 7th, and 8th sections of the 13th article of the constitution of Texas; acts of Congress of 1845 and 1846, 17 Ib. 23, § 3.

See act of 14th January, 1843, Hartley's Digest, 649.

It is evident that the rights of individuals to real estate in Texas were based upon the constitution and laws of the republic. By virtue of these, lands were acquired and held. It is evident that the constitution and laws could at all times have been annulled by the same power that created them. Had this been done, then we contend that all private property would have reverted immediately to the general mass. For a distinguished author has truly said, "Property and laws are born together and die together. Before laws were made, there was no property; take away laws, and property ceases." J. Bentham's Theory of Legislation, 139. If the people of Texas would do this while they had an independent government, they could certainly do what was far less than this; namely, could say that certificates of this class sued on should be established in the mode prescribed in their constitution, or that they should never be established at all.

Mr. Justice GRIER delivered the opinion of the court.

A brief statement of the history of this case will be necessary to a correct apprehension of the points involved.

By the colonization laws of Mexico in force in the State of Texas before their revolution, every married man who became a settler or colonist was entitled to a square league of land. In 1835, when Texas declared her independence, the faith of the republic was pledged that all who would perform the duties of citizens should receive the benefit of this law; accordingly, in the constitution of the new republic, adopted on the 17th of March, 1836, it was provided, that all white persons "residing in Texas on the day of the declaration of independence should be considered citizens of the republic, and if they had not previously received land under the colonization laws should be entitled, every head of a family to one league and labor of land," &c.

In 1837, December 14th, an act of the Congress of Texas was passed, establishing a land-office, and authorizing the ap-

pointment of certain commissioners with power to grant cer-. tificates of claims to land to all persons who should make proof that they were entitled to them.

Immense numbers of these certificates were soon put in cir-' culation, either forged or fraudulently obtained, which, if con- firmed by surveys and patents, would soon have absorbed all the vacant land in the republic. To guard against such impo- sitions, an act was passed on the 29th of January, 1840, enti- tled " An Act to detect fraudulent certificates," by which a new board of commissioners was appointed " to inspect the board of land commissioners of each county, and ascertain by satisfactory testimony what certificates were genuine and legal." All others not so reported were forbidden to be sur- veyed or patented. This was followed on the 4th of February, 1841, by a supplement, in which persons holding certificates not reported genuine and legal by the board of commissioners, were permitted to enter suit against the government, and have a trial by jury to establish the genuineness and validity of their certificates ; and if found valid, and so certified by the court, the claimant should be entitled to a survey and patent.

In 1843, a statute of limitation was passed, requiring all suits to establish certificates and claims to be instituted before the 1st day of January, 1844.

Thus it appears that, after the 1st of January, 1844, all claimants of these head rights under the constitution of the republic and its land law of 1837 were barred, and their cer- tificates of no validity whatever, unless suit has been brought and their genuineness established in a court of justice ; and this continued to be the case, till the adoption of the new con- stitution, previous to the admission of Texas as a State of the Union, in 1845.

The eleventh article of that constitution provided as tol- lows : —

" Sect. 1. All certificates for head right claims, issued to fictitious persons, or which were forged, and all locations and surveys thereon, are; and the same were, null and void from the beginning.

" Sect. 2. The District Courts shall be opened until the first day of July, one thousand eight hundred and forty-seven, for the establishment of certificates for head rights not recom- mended by the commissioners appointed under the act to detect fraudulent land certificates, and to provide for issuing patents to legal claimants ; and the parties suing shall produce the like proof, and be subject to the requisitions, which were necessary, and were prescribed by law, to sustain the original applications for said certificates ; and all certificates above re-

ferred to, not established or sued upon before the period limited, shall be barred, and the said certificates, and all locations and surveys thereon, shall be for ever null and void; and all re-locations made on such surveys shall not be disturbed until the certificates are established as above directed.".

This is a succinct history of the legislation complained of by the plaintiff. He instituted this action in the District Court of the State of Texas for the county of Galveston. It is a bill or petition for a mandamus to the defendants (who are the surveyor and the deputy surveyor of the district), commanding them to make a survey of a certain certificate granted on the 20th of June, 1838, by the land commissioners of the county of San Augustine to Colin T. McRea, for one league and labor of land, &c. The plaintiff claimed to be the assignee of this certificate. The defendants alleged in their answer, that they were forbidden by law to survey this certificate, as it had not been returned as genuine and legal by the commissioners under the act of the 29th of January, 1840, nor had any suit been brought to establish its genuineness before the first day of July, 1847, according to the provisions of the constitution. The court refused to grant the mandamus; and on writ of error to the Supreme Court of Texas, their judgment was affirmed.

To the judgment of the Supreme Court of the State this writ of error has been prosecuted, under the twenty-fifth section of the Judiciary Act.

The sum of the argument on which the plaintiff founds his claim to our interference seems to be, that the republic of Texas was under obligation to make these grants of land. That all grants made by the land commissioners under the act of 1837 were in their nature judicial decisions, and, whether fair or fraudulent, their validity could never after be inquired into. That such certificate constituted a perfect right to the quantity of land awarded, and all legislation of the republic of Texas, appointing new tribunals to examine their genuineness and legality, or to limit the time within which the holder or assignee of a certificate may demand a survey and patent, is void, because it impairs the obligation of contracts; and the eleventh section of the constitution of the State of Texas is void for the same reason.

If it were necessary for this court to consider these arguments, it would be a sufficient answer to say, —

1st. That the certificates are not in the nature of judicial decisions vesting title in the holders, whether forged or fraudulent.

2d. If they were judicial decisions, a State may grant new trials, and make new tribunals of review in order to detect

fraudulent grants or reverse fraudulent judgments, without impairing the obligation of any contract.

3d. Judgments as well as grants obtained by fraud or collusion are void, and confer no vested title; and a State may justly require those who claim that their grants are not of this character to make proof of their genuineness in some proper tribunal before they can be entitled to a survey or patent under them, and may limit the time within which suits may be instituted. The United States have pursued this course with regard to French and Spanish grants, and it has never been alleged that they thereby impaired their contract (contained in the treaty) to protect valid grants.

4th. The eleventh article of the constitution of the State of Texas avoids none but forged and fraudulent certificates, and extends the time within which valid ones may be established by suits against the State, and therefore annuls no vested rights and impairs the obligation of no contract, but, on the contrary, confers a right which had been lost and forfeited by the laches of the party.

5th. And lastly, if the Congress of Texas had abolished all these certificates, whether fraudulent or genuine; or if the people of Texas had done the same thing by their constitution adopted before their admission as a State of the Union, their right to do so could not be questioned by this court, under any power conferred upon them by the twenty-fifth section of the Judiciary Act.

There is no allegation that the legislature of the State of Texas has passed any law impairing the obligation of contracts, or affecting vested titles guarantied by the treaty of union, since that State has been admitted as one of the States of this Union. The Constitution of the United States was made by, and for the protection of, the people of the United States. The restraints imposed by that instrument upon the legislative powers of the several States could affect them only after they became States of the Union, under the provisions of the Constitution, and had consented to be bound by it. It surely needs no argument to show that the validity of the legislation of a foreign state cannot be tested by the Constitution of the United States, or that the twenty-fifth section of the Judiciary Act confers no power on this court to annul their laws, however unjust or tyrannical. How far the people of the State of Texas are bound to acknowledge contracts or titles repudiated by the late republic, is a question to be decided by their own tribunals, and with which this court has no right to interfere under any power granted to them by the Constitution and acts of Congress.

The judgment of the Supreme Court of Texas is therefore affirmed.

## Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Texas, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.