## FAHRNEY v. KELLY et al.

(Circuit Court, W. D. Arkansas, Texarkana Division. May 21, 1900.)

1. CORPORATIONS—TRANSFER OF STOCK—EFFECT OF STATUTORY REGULATIONS.
     Act Ark. April 12, 1869 (Sand. & H. Dig. § 1338), which requires a certificate of the transfer of stock by a stockholder in a corporation to be filed for record, and provides that "no transfer of stock shall be valid as against any creditor of said stockholder until such certificate shall have been deposited," is plain and unambiguous, and a court has no authority to restrict its operation by construction. Under such provision, the legal and equitable title to stock transferred remains in the transferror, as to his creditors, until the required certificate is filed; and the title of a creditor

who purchases such stock at a sale under execution or attachment against the transferror, although he pays no cash therefor, but merely credits the amount of his bid on his judgment, as he may lawfully do, cannot be impeached, in the absence of fraud, by a prior transferee, who failed to file a certificate, on the ground that the purchaser had actual knowledge of the transfer.

2. ATTACHMENT—VALIDITY—FRAUDULENT COLLUSION.

The attachment and sale by a creditor of stock in a corporation which had been transferred by his debtor, but which, owing to the failure of the transferee to have the transfer recorded as required by statute, remained the property of the transferror as to his creditors, such action having been taken in accordance with an understanding between the debtor and creditor and the corporation for the double purpose of collecting the debt and of getting the stock attached out of the hands of the transferee, who was regarded as hostile to the existing management, cannot be held in law as a fraud upon the transferee where the proceedings were regular, since all that was done was perfectly legal in itself, and there can be no such thing as fraudulent collusion to do a legal act.

3. JUDICIAL SALE—CONSTRUCTIVE FRAUD—INADEQUACY OF PRICE.

A transferee of $285,000 of the stock of a corporation worth at least $200,000 failed to record a certificate of the transfer, as required by the state statute, to render the transfer valid as against creditors of the transferror. Such a creditor, having a claim of $12,000, brought suit thereon, attached such stock, and obtained a judgment and an order for its sale. Under such order, which required the stock to be sold in solido or in blocks to suit the purchaser, he caused the entire amount of stock to be sold in bulk, and became the purchaser for $1,000, which he credited on his judgment. It was an admitted purpose of both creditor and debtor to devest the transferee of his stock. Held, that the action of the creditor in causing the sale in bulk of property so largely exceeding in value the amount of the judgment, and in purchasing it for a price so inadequate, operated as a constructive fraud upon the transferee, which vitiated the sale, and that the fact that the transferee had knowledge of the sale did not deprive him of the right to relief against it in equity.

In Chancery.

Rose, Hemmingway & Rose, for complainant.

Scott & Jones and E. D. Owen, for defendants.

ROGERS, District Judge. The facts in this case which are important to its decision are these: In the year 1896 the complainant, William H. Fahrney, by various transfers from the defendant W. J. Kelly, became the owner of $287,500 of the capital stock of the White Cliffs Portland Cement & Chalk Company, one of the defendants in this suit. It appears that this stock had been transferred as a bonus by William J. Kelly to the complainant, William H. Fahrney, and other members of the Fahrney family, and others, who had become purchasers of certain bonds of the defendant company, and the proceeds of the bonds had gone into developing and improving the plant of the defendant company, situate in the Texarkana division of the Western district of Arkansas. This stock was transferred in writing by the said William J. Kelly to the aforesaid purchasers of the bonds, as above stated. On the 29th of April, 1898, the defendant D. B. Coulter, who was familiar with these transfers of stock at the time they were made and up to that date, instituted a suit by attachment against W. J. Kelly and John Kelly in the circuit court of Little River county, Ark., and caused an attachment to be issued and levied on

said stock as the property of W. J. Kelly. Afterwards he recovered a judgment against the said defendants William J. Kelly and John Kelly, and said stock was condemned to be sold to satisfy said judgment, which was accordingly done, and the sale approved by the Little River circuit court. At that sale D. B. Coulter, the judgment creditor, became the purchaser of all of said stock, which was, at his request, sold in a lump for the sum of $1,000. He paid no money, but his judgment was credited with that amount. As stated, he knew when the attachment was levied that W. J. Kelly had assigned this stock, and was not the real owner thereof. He also was notified at the sale, and before the sale was made, that the complainant was the owner,—a fact which it is fair to say, from the proof in the case, he knew beforehand. It is not found that there were any irregularities in the levying of the attachment on the stock. This bill is filed to vacate that sale, to quiet complainant's title to said stock, to cause the title of the said Coulter to be canceled, and to enjoin the corporation and its secretary from transferring said stock on the corporate books to the said Coulter, and to register the same as the stock of the complainant, and for other proper relief.

On the 12th of April, 1869, the legislature of Arkansas passed an act entitled "An act to provide for the creation and regulation of incorporated companies," the twelfth section of which is in the following words:

"The president and secretary of every corporation, organized under the provisions of this act, shall annually make a certificate showing the condition of the affairs of such corporation, as nearly as the same can be ascertained, on the first day of January or of July, next preceding the time of making such certificate, in the following particulars, viz.: The amount of capital actually paid in: the cash value of its real estate; the cash value of its personal estate: the cash value of its credits: the amount of its debts; the name and number of shares of each stockholder: which certificate shall be deposited on or before the fifteenth day of February or of August, with the county clerk of the county in which said corporation transacts its business, who shall record the same at length in a book to be kept by him for that purpose; and whenever any stockholder shall transfer his stock in any such corporation, a certificate of such transfer shall forthwith be deposited with the county clerk, as aforesaid, who shall note the time of said deposit, and record it at full length in a book to be kept by him for that purpose; and no transfer of stock shall be valid as against any creditor of such stockholder until such certificate shall have been so deposited."

This section of that act has been divided by the digester into two sections, namely, sections 1337, 1338, Sand. & H. Dig. Ark. At the time said attachment was levied that provision of the section of the statute above quoted, which is as follows: "Whenever any stockholder shall transfer his stock in any such corporation, a certificate of such transfer shall forthwith be deposited with the county clerk aforesaid, who shall note the time of said deposit, and record it at full length in a book to be kept by him for that purpose; and no transfer of stock shall be valid as against any creditor of said stockholder until such certificate shall have been so deposited,"—had not been complied with by the complainant. In other words, from the time of the transfer of this stock, in the year 1896, down to the institution of the attachment suits, in the year 1898, the certificate required by the

statute which is quoted had not been filed with the county clerk of Little River county, Ark., where said corporation transacts its business and its properties are located.

The question, therefore, arises whether, under the facts of this case, the defendant Coulter acquired any title to said stock as against the complainant in this suit. In view of the elaborate briefs and oral arguments and the exhaustive examinations of the decisions of the various state and federal courts throwing light upon this subject by the eminent counsel interested therein, if time permitted it would be an unprofitable work for the court to enter upon the discussion, either upon principle or upon authority, of the numerous cases which have been cited, or to review the able and exhaustive arguments, oral and written, which have been made upon the subject. The court in this case must content itself with stating its conclusions.

It may be admitted that the very able and persuasive arguments of the eminent counsel for the plaintiff, if addressed to a legislative body, would be well-nigh conclusive of the manifest impropriety of permitting the section of the statute quoted above to continue longer upon the statute books without amendment. A literal interpretation of that statute practically paralyzes the handling of the stocks of corporations, organized under the statutes referred to, by the commercial world, and the statute itself is entirely out of harmony with the great mass of statutory law of the different states in this country, and is hostile to that free transfer of corporate stocks found essential to the commerce of the country at this day. But, while this is true, it is the province of the court, not to amend the statute, but to interpret and enforce it.

An effort was made in two cases (Deutschman v. Byrne, 64 Ark. 111, 40 S. W. 780, and Batesville Tel. Co. v. Myer Schmidt Grocer Co. [Ark.] 56 S. W. 784) to secure an interpretation of this statute by the supreme court of Arkansas. The first case passed off upon an irregularity in the levy of the attachment, and the second was disposed of, as was also the case of Masury v. Bank, 35 C. C. A. 476, 93 Fed. 603, decided by the United States circuit court of appeals for the Eighth circuit, in both of which cases it was held that the word "transfer," found in the statute, did not embrace stock assigned as collateral security; so that the precise question now presented in this case, of an absolute sale of stock, has never been passed upon either by the supreme court of this state, or by any other appellate tribunal. There is little in either of these decisions from which the court can obtain any light as to what construction this statute should have, except that in Batesville Tel. Co. v. Myer Schmidt Grocer Co. there was a dissenting opinion by two of the judges, who held that the word "transfer" embraced not only stock absolutely sold, but also that which had been transferred as collateral security.

After the most careful consideration which I am capable of giving this case, I have reached the conclusion that the language of this statute is so plain as to forbid the court to place any interpretation upon it which would have the effect of interpolating into it any change whatever. It states in so many words that "no transfer of stock shall be valid as against any creditor of such stockholder until such certifi-

cate shall have been so deposited." It limits the provisions of the statute to a creditor. By its terms it makes it applicable to all creditors of such stockholder. To uphold the contention of the complainant, the court would be compelled to interpolate into this statute language so as to make it read: "And no transfer of stock shall be valid as against any creditor of such stockholder until such certificate shall have been so deposited, unless such creditor had notice before or at the time the attachment was levied (or at some subsequent time that the court must arbitrarily adopt) that the judgment debtor had made a transfer of the stock attached." It is insisted that this is precisely what the supreme court of Arkansas did in the case of Byers v. Engles, 16 Ark. 543. This is not strictly true, because the statutes are worded differently, although the court did import, by construction, into the terms of that statute, language equivalent to that which is now contended for with reference to this. The statutes, however, are different. It is, however, a difficult thing, notwithstanding the difference in the terms of the statutes, to draw a well-defined distinction, upon any well-recognized principle, between the construction which should be placed upon the statute under consideration and the one which was under consideration in Byers v. Engles, supra; and it is equally as difficult a thing to draw any well-defined distinction, upon any well-recognized principle, between the statute now under consideration and the statute under consideration in Main v. Alexander, 9 Ark. 112, where a different construction was placed upon a similar statute. It is not deemed essential to the decision of this case that the court should undertake it. It is enough to say that in the statute under consideration the legislature has said that "no transfer of stock shall be valid as against any creditor of such stockholder until such certificate shall have been deposited." It is not within the province of the court to define what shall be the public policy of the state with reference to the transfer of corporate stocks. That is a matter which should be remitted to the legislature of the state. In Erwin v. Turner, 6 Ark. 17, the court approvingly quote the language of Lord Coke to the effect that, "where the legislature have made no exceptions, the judge can make none, and that infants and feme coverts would have been barred by the common act of limitations had they not been excepted therein."

The case at bar presents one of great hardship,—one which does not address itself to the moral sense of the chancellor; but it is not for the chancellor to nullify a statute because he does not approve the principle it establishes. The statute of this state regulating the transfer of stock has been in force for more than 30 years, and if persons who deal in stocks fail to inquire into the methods of transfer as fixed by the statutes of the state where the corporations are created, and elect to sleep upon their rights, it is their own fault, and they must suffer the consequences which follow their own neglect. Bank v. Morris, 13 Ark. 291; Pryor v. Ryburn, 16 Ark. 694; Bennett v. Worthington, 24 Ark. 493; Railroad Co. v. Cariley, 39 Ark. 246; Sims v. Cumby, 53 Ark. 421, 14 S. W. 623.

But it is insisted that Coulter, purchasing under his own attachment, having paid nothing, but only crediting his judgment with the amount

of his bid, is not an innocent purchaser, but acquired only such title as the judgment debtor had in the property purchased. The general principle may be conceded; but, in the absence of fraud, is the complainant in an attitude to raise that question as against Coulter? If the court has not misconstrued the statute, as against an attaching creditor complainant acquired nothing by his purchase of the stock from Kelly. As to an attaching creditor, Kelly held both the legal and equitable title to the stock claimed by complainant. There was nothing in the statute prohibiting Coulter from purchasing at the sale. If it be conceded, therefore, that Coulter is not an innocent purchaser, his title, such as it is, is not open to assault by plaintiff on that ground, since as to Coulter, he being a creditor of Kelly, complainant had no title, either legal or equitable. To hold otherwise is to practically nullify the statute. It is to say, in effect: "Coulter's debt was honest, his levy by attachment legal and in conformity to the statute, his judgment against Kelly, his order sustaining the attachment, and the sale under it were regular and legal, but nevertheless he acquired nothing by his purchase as against complainant, who had no title, although Coulter had a perfect right, under the law, to become a purchaser at the sale." The fact is, the principle contended for has no application to a case such as this, and that question must relate back to the question of the proper construction of the statute. It must be borne in mind that what is here said proceeds upon the assumption that the proceedings in the attachment suit were free from fraud. But it is insisted that Kelly and his counsel and Coulter and his counsel colluded together to have Coulter, who knew that W. J. Kelly did not own the stock in controversy, attach it, not for the bona fide purpose alone of collecting Coulter's debt, but for the further purpose of sweeping away Fahrney's stock, thereby depriving him of a voice in the control of the defendant company. An examination of the proof leads the court to the conclusion that, when Coulter first placed his note upon which the judgment in the attachment case was rendered in the hands of Scott & Jones, it was done with the purpose of taking such steps as would make the debt safe, and because he was apprehensive of the financial condition of the Kellys, to whom he had made concessions until he had no security whatever for the note.

Mr. E. D. Owen, who was the attorney for the White Cliffs Portland Cement & Chalk Company, which was under the management of the Kellys, being questioned by Mr. Jones, attorney for Coulter, testifies:

"When was the first time that the relation of attorney and client ever existed between you and Col. Coulter? A. At the time that the question came up in regard to this attachment I was consulting with Mr. Kelly as to the attitude of the White Cliffs Portland Cement & Chalk Company and of themselves towards such an attachment. We went to your office to talk the matter over. You at that time advised that you thought the attachment would be legal. I hesitated. Afterwards I became convinced that the attachment would stand, and then consented to join forces in this matter, in view of the fact that my clients would be benefited by the transaction. But up to that time I never represented Col. Coulter in anything. Q. In what manner did you consider that your clients would be benefited if Coulter succeeded in his attachment? A. The Fahrneys had, for a good while, been taking steps lead-

ing towards the foreclosure of their mortgage. The antagonism of the Fahrneys to the Kellys and the general stock of this company was well known to me. They held at that time the first mortgage. The company had no money to pay the interest on that mortgage. There was danger of the stock being wiped out by the Fahrneys, which was the effort on their part. It was better for the stockholders of the White Cliffs Portland Cement & Chalk Company, and better for the Kellys, and better for me as a stockholder, outside of this stock that has been spoken of, that this stock should be in the hands of a friend of the company, rather than in the hands of an enemy, who was trying to destroy it. It was therefore obviously to the interest of all concerned, so far as those I represented were interested, that Col. Coulter should have this stock in preference to the Fahrneys. I knew all about the various transactions between the Kellys and the Fahrneys, and I knew all about the claims of the Kellys in regard to the violation of their contracts. In view of all those facts, I considered it to the advantage of the White Cliffs Portland Cement & Chalk Company and all the rest of us that Col. Coulter should have this stock."

D. B. Coulter, being interrogated by Mr. Jones, in his evidence testifies as follows:

"Q. Now state, Col. Coulter, the reasons you had for levying upon the Fahrney stock, and not upon the other stock, in which Kelly had an interest, and which had been assigned to Edenborn. A. To have levied upon the Kelly stock would have embarrassed that stock. Fahrney had a mortgage upon this property, and if he foreclosed that it would have made the balance of it worthless, and squeezed me out. * * * Q. Now, levying upon the Fahrney stock, and leaving the other stock unincumbered, what effect, in your judgment, would that have upon the value of the stock? A. Upon the stock I would levy on, or the other stock? Q. The stock of the entire plant? A. I think it would have made it more valuable by getting hold of this stock. I would leave the other stock unincumbered, and it would be in the hands of parties who would raise the money on it. Q. After we arrived at this conclusion as to what stock it was better to levy upon, state if you gave your attorneys any further instructions, or whether they, after that, managed the case according to their judgment. A. They managed it nearly entirely. I don't think I had but one or two little interviews. We had correspondence on the subject, and very little of that. I merely carried out your instructions. * * * Q. You say that up to the time you went to Chicago, Judge Owen had never represented you as attorney? A. No, sir; I had never met Judge Owen. Q. Had he ever represented you as attorney up to the time that you met him in Scott & Jones's office? A. No, sir. Q. Was he your attorney then? A. Yes, sir; he was in the case from that time on. Q. Then, in that interview at Scott & Jones's office, Judge Owen and Messrs. Scott & Jones were all advising in your interest? A. Yes, sir. Q. Judge Owen was the attorney for the Kellys and for the White Cliff Portland Cement & Chalk Company also? A. I suppose so. Scott & Jones had the meeting, and did most of the talking. I presume he was. I don't know what interest he had. I never employed him in that business. I could not testify what he had to do with the White Cliff Portland Cement & Chalk Company. Q. That was for the purpose of enabling you to sell this stock? A. Yes, sir; they advised me to attach that stock. Q. Judge Owen with the others? A. Yes, sir; I think Judge Owen with the others. * * * Q. What efforts have you made since you recovered the judgment to enforce its collection, outside of the levy upon the stock which was sold? A. I presume that there has been no effort further than that, that I know of; that I remember of. Q. Why was it, colonel, that you didn't levy upon the stock held by the Kellys, or which appears on the books of the company to belong to Kellys, at that time, and why didn't you levy upon the stock which had been sold to Edenborn, or upon that which had been assigned to Edenborn as collateral? A. I believe I stated that; that I didn't want to embarrass that part of the stock, and I was acting entirely under the advice of my counsel about the stock. Had I done the other, and embarrassed that, that would give Mr. Fahrney an opportunity to foreclose the mort-

gage, and doing what he said he was going to do, and close the mortgage out. Q. If you had levied upon the stock, could not the person who afterwards purchased at the sale, or could not you have purchased at the sale, and permitted it to be used as it was used? (Objected to as asking for a conclusion, immaterial, and argumentative.) A. I am not sufficiently posted as to the law points in this case, and I was acting entirely under the advice of my counsel. I left it entirely with them. I told them to save me in the matter, if they could, and collect my money. I have done all along what they said, as near as I could."

It is impossible to read this testimony without the conviction that from the time of the meeting in Scott & Jones' office, at which it was determined what stock should be levied upon, that both Owen, who was the attorney for the White Cliffs Portland Cement & Chalk Company, and also for William J. Kelly, became also, in conjunction with Scott & Jones, the attorney of D. B. Coulter, and that the attachment proceedings had in view two objects: First, to wipe out the stock of the Kellys by transferring it through the attachment proceedings to Coulter; and at the same time to collect Coulter's debt. It is impossible to avoid the conclusion that, whatever may have been Col. Coulter's desire, it was a war between the Kellys and the Fahrneys as to who should control the stock of the company, and thereby its management. Otherwise, the attachment might have been levied upon the stock of Kelly and that of other persons, which latter occupied precisely the same attitude as that of the Kellys.

The query, therefore, arises whether or not the institution and prosecution of this attachment suit for the double purpose stated constituted a fraud upon the rights of the complainant in this suit. In the argument, as the court understood it, it was broadly conceded that the object of the suit was to collect the debt, and also to get the stock of the Fahrneys into hands friendly to the existing management of the company, and it was contended that, admitting that to be true, it fell far short of establishing a fraud. Assuming, therefore, that there were no irregularities in the levy, or in any of the proceedings, up to the time of the sale, the court is of opinion that such joint action upon the part of Coulter, of the White Cliffs Company and the Kellys, and their respective counsel, did not, in law, of itself constitute a fraud; for the reason that there can be no such thing as a fraudulent collusion to do a thing which in itself is perfectly legal, if done in a legal way. In other words, the institution and prosecution of the attachment suit, and the levy of the attachment upon the stock of the complainant for the purpose of satisfying the debt of the Kellys, with the full knowledge of all the parties that Kelly had transferred his title to the stock to Fahrney, was not a fraud, because the statute made the assignment of the stock of Kelly to the Fahrneys invalid until a certificate thereof had been filed with the county clerk of Little River county. Nor does the mere fact that the White Cliffs Company, the Kellys, and Coulter had also the ulterior purpose of depriving the Fahrneys of their stock, of itself, constitute a fraud, for the reason above stated. And this brings us to the consideration as to whether or not, keeping in view the double-purpose of these attachment proceedings, it was a fraud against the rights of the complainant to cause to be sold in bulk $285,000 of stock to satisfy a debt of about $12,000. It is somewhat

difficult to place an accurate estimate upon the value of this stock, but the court is satisfied, from an examination of the evidence, that it was worth many times the value of Coulter's judgment.

In the case of Byers v. Surget, 19 How. 306, 15 L. Ed. 671, the court stated the facts of that case as follows:

"Upon this extraordinary judgment, the appellant, as the attorney for the defendant in the inferior court, assumed to himself the power to tax the costs adjudged to the defendant; to tax them, not in the capacity of clerk, the agent created by law for the performance of that service, nor in that of the legal deputy or subordinate of that officer, but, as it has been asserted, as a sort of amicus clerici, and with equal benevolence, or in order to remedy the ignorance and imbecility which, by way of justification of the appellant's acts, it is attempted to be shown characterized the ministers of the law in that unfortunate locality, assumed to himself the power and the right not only of selecting the final process, but of prescribing also the description and the quantity of the property which he chose to have seized in satisfaction of the process; of furnishing a list of the parcels and amounts which he chose to have thus seized; of ordering the sheriff to levy upon the whole of what he had so described; of preparing himself and furnishing to the officer such advertisement for the sale of the property levied upon as he approved; of requiring of the sheriff, under peril of responsibility for refusal, towards the satisfaction of an execution for thirty-nine dollars and ten cents, peremptorily to make sale of more than fourteen thousand acres of land, estimated by the witnesses from forty to seventy thousand dollars; and finally, under a proceeding irregular in its origin, commenced by himself, and by him controlled and managed to its consummation, of becoming the purchaser of the property estimated as above for the sum of nine dollars thirteen and one-half cents."

In that case the judgment was criticised by the court as being irregular, but the opinion of the court in that case was not based upon any irregularities in the judgment, for the court say:

"It is true that, with respect to the regularity of that judgment, or of any legal errors in obtaining it, this court or the circuit court could not take cognizance, nor exercise any appellate power for its reversal, and, in any collateral attempt at law to impeach that judgment, it must be regarded as binding and operative. But with any fraudulent conduct of parties in obtaining a judgment, or in attempting to avail themselves thereof, this court can regularly, as could the circuit court, take cognizance. Such a proceeding is within the legitimate province of courts of equity, and constitutes an extensive ground of their jurisdiction. The true and intrinsic character of proceedings, as well in courts of law as in pais, is alike subject to the scrutiny of a court of equity, which will probe, and either sustain or annul, them, according to their real character, and as the ends of justice may require."

The court then proceeds to criticise various irregularities in the proceedings.

It should be stated in this connection that no irregularity in the proceedings of the court, down to the recovery of the judgment, has been called to the attention of the court, and it must also be assumed that the judgment which Coulter recovered was upon a bona fide debt. But with reference to the gross inadequacy of consideration the court in Byers v. Surget, supra, said:

"To meet the objection made to the sale in this case, founded on the inadequacy of the price at which the land was sold, it is insisted that inadequacy of consideration, singly, cannot amount to proof of fraud. This position, however, is scarcely reconcilable with the qualification annexed to it by the courts, namely, unless such inadequacy be so gross as to shock the conscience; for this qualification implies necessarily the affirmation that if the inadequacy be of a nature so gross as to shock the conscience it will amount to proof of

fraud. Again, in answer to the same objection, it is insisted that, whatever presumption arising from inadequacy of consideration may be permitted with respect to transactions strictly limited to vendor and vendee, no unfavorable inference from 'that cause is permissible with respect to sales made under judicial process. Certainly the facts that sales are made by the officers or ministers of the law, and under its authority, may properly weaken the usual presumption arising from gross inadequacy; but to declare that such inadequacy, connected with other facts and circumstances evincing fraud or unfairness, could never be regarded as affecting sales under process, would be as rational as the assertion that process of law could never be abused, and that the ministers of the law must necessarily be intelligent and upright, and incapable of being ever willingly or unwittingly made the instruments of fraud or oppression. But the transaction now under review can with no show of propriety be tested by the single fact of inadequacy of consideration, however gross and extraordinary that inadequacy has been. We perceive in this transaction other ingredients, that have been mingled therewith by the appellant, that give to the objection of inadequacy an effect that, standing isolated and alone, could not be ascribed to or deduced from it. Thus, when we advert to the irregular and extraordinary character of the judgment procured through the agency of the appellant; to his eagerness, that could not await the action of the officer of the court; his assumption of the functions of the clerk, in taxing the costs, and in writing out the execution; his preparation and delivery to the sheriff of a description and list of the lands of the appellee, amounting to more than fourteen thousand acres; his requisition of a seizure of the whole of those lands in satisfaction of the sum of thirty-nine dollars; his inflexible demand upon the sheriff, under threats of. prosecution, to expose to sale the entire levy; his purchase of all these lands for the sum of nine dollars and thirteen and a half cents; and his refusal after the sale and purchase to accept, in redemption of these lands so sacrificed, a sum of money tendered to him much more than equal to the costs, with all the expenses incident to the judgment,—when all these acts on the part of the appellant are adverted to, they impel irresistibly to the conclusion that gross inadequacy of consideration in the sale and purchase of these lands was the premeditated result which the proceedings by the appellant were put in practice to insure. They betray that malus dolus in which the design of the appellant was conceived, which appears to have presided over and regulated the progress of the design from its birth to its consummation, to which design the appellant has tenaciously clung, in the seeming expectation that it was beyond the corrective powers of law or justice"

While there are striking differences between the case of Byers v. Surget, supra, and the case at bar, it cannot but be observed that there are striking similarities also. It does not appear what motive influenced Byers to levy upon 14,000 acres of land for the purpose of satisfying a judgment for costs amounting to less than $30, nor is it important to inquire, since it could not possibly alter the result. In the case at bar, however, it was not simply the collection of a debt that was sought, but there was a war between the Kellys and the Fahrneys, and the claim of Coulter (though perhaps not so intended when it was first placed in the hands of Scott & Jones for collection) afterwards became an instrument of warfare, offensive and defensive; and the court cannot resist the conviction that the terms of the order of sale (which I cannot think was ever called to the attention of the court, providing that "11,500 shares of capital stock be sold for cash, and that the same be sold in solido, or in blocks to suit the purchaser, of not less than 1,000 shares in each block") were taken, and the sale in bulk of $285,500 of stock estimated to be worth $200,-000 had to satisfy a judgment of $12,000, because of a desire not alone to collect the debt, but also to get the stock of Fahrney into the

hands of some one friendly to the Kelly interests. Nor does the fact that the statute does not prohibit or direct how personal property shall be sold palliate the injustice of this order, nor does the additional fact that the sale was made in conformity with the terms of the order alter the situation.

In Graffam v. Burgess, 117 U. S. 180, 6 Sup. Ct. 686, 29 L. Ed. 839, the court laid down these two propositions:

"A judicial sale of real estate will not be set aside for inadequacy of price unless the inadequacy be so great as to shock the conscience, or unless there be additional circumstances against its fairness. Great inadequacy of price at a judicial sale of real estate requires only slight circumstances of unfairness in the conduct of the party benefited by the sale to raise a presumption of fraud."

In the body of the opinion they say:

"It is insisted that the proceedings were all conducted according to the forms of law. Very likely. Some of the most atrocious frauds are committed in that way. Indeed, the greater the fraud intended, the more particular the parties to it often are to proceed according to the strictest forms of law."

In that case the property sold was worth $10,000, and it was sold for a paltry sum of less than $200. In that case the defendant knew that her property had been sold, but she let the year expire in which she could redeem it. The parties who bought it, after the purchase used various devices for the purpose of lulling to security the owner of the property until the year had expired, and then procured the deed thereto, but the court vacated the sale, and allowed her to redeem; the effect of which was to absolutely set aside the terms of the statute because of the fraud which had been perpetrated upon her by lulling her into security until the year for redemption had passed by.

In paragraph 296, 2 Freem. Ex'ns, the author lays down the rule that:

"Where several distinct parcels of real estate or several articles of personal property are to be sold, what is called a 'lumping' sale can rarely be justified. Such a sale, when objected to in due time, will not be upheld, unless special circumstances can be shown from which it can be inferred that such sale was either necessary or advantageous."

Upon this precise point, and where no fraud, either actual or constructive, is involved, the authorities are not entirely uniform. In some states the sale is held absolutely void where two or more tracts, or two or more articles of personal property, are sold in a lumping sale. In others it is held that the sale is not absolutely void, but only voidable. But it is believed that the great weight of authority in both state and federal courts is to the effect that, where fraud has entered into the transaction, neither execution sales, nor judicial sales, even where the sale itself has been confirmed by the court, or decrees or judgments of any kind, will be permitted to stand in the way of the vacation of sales, where the proper remedy is sought in apt time. At all events, such is the rule established by the supreme court of the United States. The case of Monger v. Shirley, 22 L. Ed. 449, is a case strongly in point. In that case, like this, the proceeding was by attachment in the circuit court of Hamilton county, Tenn. The note upon which the suit was brought was a forged note.

Judgment was recovered upon it by Monger, and the farm belonging to Shirley sold, and bought in by Monger. A bill was filed in the federal court to annul the whole proceeding upon which the judgment was recovered and the land sold. The court in that case say:

"The power of a court of equity to annul judgments and decrees, and all titles acquired under them, for fraud, where the rights of bona fide purchasers have not intervened, is too well settled to require discussion. Freem. Judgm. §§ 486, 489, 491; 1 Story, Eq. § 252."

In conclusion the court add:

"It would be a reproach upon the administration of justice if such a title, thus acquired, could avail to defeat the rights of the complainant, and give triumph to the iniquity which has been practiced upon him."

In U. S. v. Steenerson, 4 U. S. App. 332, 1 C. C. A. 552, 50 Fed. 504, the court said:

"Fraud vitiates any transaction based thereon, and will destroy any asserted title to property, no matter in what form the evidence of such title may exist. The Amistad, 15 Pet. 518, 10 L. Ed. 826; League v. De Young, 11 How. 185, 13 L. Ed. 657."

Jennings v. Carter, 53 Ark. 242, 13 S. W. 800, was a case of this kind: Three separate plaintiffs had recovered judgments against Carter. Executions were sued out and levied on Carter's homestead, without his knowledge. The sale of the property was advertised in a paper remote from the homestead, but in the same county, and with no circulation likely to reach Carter. Notice of the sale was posted on a fence rail on Carter's fence, some distance from his residence. It was also posted on a tree, a quarter of a mile from Carter's residence. The sheriff explained this conduct by saying it saved distance, and he wanted to avoid the unpleasantness of publishing the notice where Carter's family could see him. At the sale, West, who was the attorney for one of the plaintiffs in execution, and who conducted all the proceedings for the sale, bought the land for Devin. Under another judgment in favor of Jennings, Jennings became the purchaser, and Vernin and Skillern, the other judgment creditors, also became purchasers under a third sale. Subsequently Jennings purchased the interests of Devin, Vernin, and Skillern, got deeds from them, and agreed to pay for the land in case of recovery. The defendant knew nothing of either levy or sale until the sale of his homestead had been made. Jennings brought ejectment against Carter to recover the land. Carter filed a cross bill, had the case transferred to equity, and the court canceled all the various deeds. The supreme court, in passing upon the case, said:

"Upon a careful reading of the evidence in this case, we are led to the conviction that the proceedings before the sale were conducted under the direction of the plaintiffs in execution with the hope and to the end that the appellee would never learn of the pending sale, and thereby lose his homestead. In order to accomplish the wrong, they attempted to defeat the purpose of the law in providing notices for a sale, while making a pretense of observing it. They could acquire no rights through such a proceeding. It is contended that title passed, untainted with fraud, to Devin, who was a stranger to the proceeding. and from him to appellant. To this it is a sufficient answer that Devin purchased through West, his attorney, who placed the proceeding to sell upon foot, and consummated it after the relation was fixed. Devin is affected with the knowledge of West, and on trial he testified that he 'thought it likely

the notice had been published with the intent of preventing appellee and his friends from seeing it.' We think the appearances justified that impression. Creditors cannot take advantage of the temporary absence of their debtors to obtain execution, give notice of sale, which will never reach the debtors or their friends, and thereby deprive them of their constitutional exemptions. Such efforts should not be made, and can never receive the countenance of the court. As the land has not passed to a bona fide purchaser for value, the appellee was entitled to the relief asked [and the judgment was affirmed]."

It will be observed that in this case every requirement of the statute was literally and punctiliously observed, but the method in which the notice was given was a fraudulent device to defeat the very objects for which the notice was given. The court pronounced it a fraud, and set aside the sale. Perhaps no stronger case can be found in the books of how a fraud may be perpetrated, and yet every requirement of the law be observed, than that case, which met the condemnation of the supreme court of Arkansas.

In Atkins v. Dick, 14 Pet. 119, 10 L. Ed. 381, the supreme court of the United States say:

"The question is whether a party who has received payment of his debt shall be permitted by a court of equity to avail himself of a judgment at law to enforce a second payment, and that, too, against a party who did not know of that payment until after the judgment was obtained. To state such a proposition is to answer it. The bill further charges the defendants with fraud, and this, too, is admitted by the demurrer. If there be any one ground upon which a court of equity affords relief with more unvarying uniformity than another, it is an allegation of fraud, whether proved or admitted."

It must be admitted that in the case at bar there was no concealment, so far as the record discloses, in the actions of the counsel who conducted the attachment proceedings for Coulter. What they did seems to have been done openly, and with the conviction that no legal right of the complainant was invaded thereby, nor is the court prepared to say that either Coulter or they intended by the attachment proceedings to commit any fraud upon the rights of the complainant. But the question is not what their conviction of the law was nor what they intended. The question now under discussion is, was the action of Coulter, under the advice of his counsel, in taking the order of sale referred to, and in causing $285,000 of stock to be sold in bulk for the payment of a judgment of but $12,000, such an action as would operate as a constructive fraud upon the rights of the complainant? It is, of course, conceded that, as between W. J. Kelly and all other persons, except the creditors of Kelly, Fahrney was the owner of this stock; and, while he is not in an attitude to assail the attachment proceedings so long as they are free from fraud and are regular, it is equally clear that, being the real owner of the stock as to all persons except a creditor, he has the right to be heard before he can be deprived thereof by any proceedings (even by a creditor fortified by the statute) which are not free from either actual or constructive fraud.

In view of the decisions which I have quoted, and the principles which they establish, and which are sustained by ample authority, the court is of opinion that the sale of this stock in bulk was a constructive fraud upon the rights of the complainant. The order of sale by the Little River circuit court, directing the stock sold in solido

or in blocks to suit the purchaser of not less than $25,000, was, of itself, to say the least, unusual; and it must be assumed that if the facts had been fully understood by the court, instead of the stock having been sold in blocks of $25,000, it had been sold in bulk, and that the stock, shown by some of the evidence to be worth 80 cents on the dollar, had been sold for one cent on the dollar, it would not have confirmed the sale, notwithstanding the terms of the order, since such action upon the part of a court would scarcely comport with enlightened judicial procedure. The probabilities are that the court never read the order of sale or the report. It was doubtless, as is customary in such cases, prepared by counsel and entered by the clerk, and the report filed, and, no exceptions having been interposed, indeed, none desired, by Kelly, and Fahrney not being a party, it was approved by the court without explanation or representations of any kind. Such is the practice as it generally obtains in the courts in some circuits,—a practice which might well be abandoned.

This stock was ordered sold in bulk by Mr. Coulter himself. He testified that he followed the advice of his attorneys in the management of this suit, and presumably they advised him on this point, and it is certain that his and their purpose was to collect the debt as far as the stock sold would bring it, and also to wipe out the stock, and silence the voice of the complainant in the affairs of the company. In a proceeding having in view such a purpose, and where the price the property brought was grossly inadequate, careful scrutiny should be had by a court of chancery of every step taken, and if it appears that the interests of the complainant have been unfairly or unjustly dealt with at any stage of the proceedings, whether it resulted from an improper motive or an error in judgment, however honest, the wrong should be righted by vacating the sale. The sale of $285,000 of stock, variously estimated in value at from $200,000 to par, at a county seat in an interior county, in bulk, upon a judgment amounting in the aggregate to $12,000, must, of necessity, have had the effect of destroying all competition in bidding. The object of every judicial sale should be to secure the highest price for the property sold, thereby relieving the debtor as much as possible of his indebtedness, and paying the creditor the largest possible amount upon his judgment. This object, purpose, and policy of the law was defeated by the course pursued, and $285,000 of stock belonging to a person not indebted to the complainant to the amount of a single cent was sacrificed for the paltry sum of $1,000. The proceeding is such as to shock the conscience of a chancellor, and where such a sale is made in bulk, so as to destroy all competition, that fact alone, taken in connection with the gross inadequacy of price, is sufficient to raise a presumption of constructive fraud, and vacate the sale, without regard to what may have been the motives or purposes of the parties conducting the same. But when it is made to appear that the ulterior, if not the primary, object of the attachment proceeding was to subject Fahrney's stock to the payment of Kelly's debt to Coulter, and at the same time get rid of Fahrney, it is difficult to resist the conclusion that the stock was sold in bulk for the purpose of destroying competition, and of accomplishing the premeditated purpose of get-

ting rid of Fahrney in the management of the company, and that otherwise the stock would have been sold in such a way as to have made it pay as much as possible upon Coulter's debt.

It is said that Fahrney was present by his counsel at the sale, and made no requests that the stock should be sold in quantities otherwise than in solido, and also caused notice to be given that the stock belonged to him, and not to Kelly, the necessary effect of which was to cause the stock to sell at a lower price than it otherwise would have done, and that, therefore, the sale should not be set aside because of inadequacy of price. To this it may be answered that Fahrney was not a party to the proceeding. The law enjoined upon him nothing in regard to that suit. He elected, as he had a right to do, to stand upon his rights, and to test the construction of the statute as well as the regularity and validity of the proceedings in the attachment suit. This he did, and in so doing he waived nothing.

The conclusion reached by the court makes it unnecessary to consider other questions presented and argued by complainant's counsel. The sale in this case will be vacated, set aside, and held for naught, and such title as the said D. B. Coulter acquired by the sale in the stock sold, and which belonged to the complainant in this suit, will be canceled, and the defendant corporation restrained from transferring said stock on the corporate books of the said company to the said Coulter, and the defendant company required to register said stock on the books of the said company as the same stood on the day the attachment was levied.